IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CURTIS INVESTMENT CO., LLC

        Plaintiff,

  v.

BAYERISCHE HYPO-UND
VEREINSBANK, AG, HVB U.S.
FINANCE, INC.,  DOMENICK
DEGIORGIO, CHENERY
ASSOCIATES, CHENERY
MANAGEMENT, INC., CHENERY
INVESTMENTS, INC., CHENERY
SERVICES, INC., ROY E. HAHN,
SIDLEY AUSTIN BROWN &
WOOD, LLP, RAYMOND J.
RUBLE, BRONDESBURY
FINANCIAL TRADING LLC, MIO
SYLVESTER, MICHAEL
SHERRY, LEBOEUF LAMB
GREENE & MCRAE, LLP, and
CYNTHIA MORELLI,

        Defendants.

           1:06-cv-2752-WSD

## OPINION AND ORDER

This matter is before the Court on Defendant Sidley Austin Brown Wood,

LLP's ("Sidley") Motion to Dismiss [75], Defendant Raymond J. Ruble's

("Ruble") Motion to Dismiss and to Join in the Motion Filed by Sidley [74],

Defendants Bayerische Hypo-Und Vereinsbank, AG ("Bayerische") and HVB U.S. Finance, Inc.'s ("HVB") Motion to Dismiss [76], Defendant Leboeuf, Lamb, Greene & Macrae, LLP's ("Leboeuf") Motion to Dismiss [77] and Defendant Domenick Degiorgio's ("Degiorgio") Motion to Dismiss [96].  Also before the Court is Plaintiff Curtis Investment Company's ("Curtis") Motion for Oral Argument [83].[1]

## I.      BACKGROUND

In 2000, Curtis realized a $29 million capital gain from the sale of highly appreciated securities.  To shield this gain from taxes, Curtis entered into a loan-based tax shelter transaction known as a "Custom Rate Adjustable Debt Structure" ("CARDS").  Curtis alleges that CARDS was represented to it as, in essence, a 30 year loan at highly favorable interest rates that would, among others things,  offset Curtis's $29 million capital gain and provide tax-advantaged capital for reinvestment.  Curtis alleges that Defendants in this case demanded repayment of

----

[1]  Ruble's supporting brief is conclusory, asserting only that Ruble wishes to join in Sidley's Motion to Dismiss.  Because Ruble does not assert any individualized arguments, the Court considers his motion only to the extent that he joins in the generalized merger, statute of limitations, and Rule 9(b) sufficiency arguments raised by Sidley.

the CARDS loan after only one year, requiring the loan balance to be repaid by December of 2001.

CARDS, and its providers, including Defendants in this case, have been investigated by federal authorities including the Internal Revenue Service ("IRS") and Department of Justice ("DOJ").  These agencies have found CARDS transactions to be illegal, at least when, as here, the loan is unwound after one year.[2]  The IRS has asserted that unwinding the transaction after only one year is a part of the CARDS plan well-understood by all participants.

The CARDS scheme purportedly allowed Curtis to report a loss to offset its $29 million capital gain using a three-step process.[3]  First, Defendant Brondesbury Financial Services, LLC ("Brondesbury") took out a loan in the amount of €35,300,000 from HVB (the "CARDS loan.") (Amd. Comp. ¶ 45 (a)).  The CARDS loan was subject to a lending agreement between Brondesbury and HVB (the "Credit Agreement").  The Credit Agreement permitted HVB to reset the

---

[2]  Defendant HVB has entered into a deferred prosecution agreement with the DOJ for crimes related to its CARDS business.

[3]  The Court notes that Curtis waited at least five years to bring this action, and did so only after the IRS began to pursue it for penalties and unpaid taxes based on Curtis's use of the CARDS loan in calculating its tax liability.

interest formula (the "spread") at the end of every calender year.  In response, the

Credit Agreement gave Brondesbury three options: 1) accept the new spread; 2)

reject the spread and solicit a new lender to purchase the loan from HVB; or 3)

repay the entirety of the loan balance themselves.   The Credit Agreement also

permitted HVB, in its sole discretion, to demand repayment of the entire loan

amount at the end of every loan year.  As collateral for the loan, Brondesbury

deposited the loan proceeds into a deposit account with HVB.  (Id. at ¶ 45(f).)[4]

The next step of the CARDS transaction required Curtis to purchase a

portion of Brondesbury's collateral in exchange for assuming joint liability with

Brondesbury for the balance of the loan. (Amd. Compl. at ¶¶ 45(g)-(j).)  Curtis

executed an Assumption Agreement (the "Assumption Agreement") in which it

assumed all of Brondesbury's obligations under the Credit Agreement, becoming a

co-obligor to the loan between Brondesbury and HVB.  Curtis also provided

substitute collateral for the portion of Brondesbury's collateral it had purchased in

the form of a letter of credit from Canadian Imperial Bank of Commerce, agreed to

---

[4]  The parties dispute whether this collateral existed in the form of
Eurodollar currency or a promissory note.

pay the annual interest on the Loan, and agreed to pay the loan principal upon maturity.  (Id. at ¶ 45(l).)

Last, Curtis sold Brondesbury's collateral to a "tax neutral third party," which the parties appear to agree was a foreign investor.  (Id. at ¶ 45(m).)  Curtis then reported the entire value of the loan as its basis for the sale of the collateral, giving it a paper loss equal to the difference between the value of loan and the value of the collateral, which largely offset its $29 million capital gain.  The CARDS transaction, on its face, thus had no economic substance beyond the payment of transaction fees from Curtis to Defendants in exchange for a plausible tax offset.

Curtis and Brondesbury executed the Assumption Agreement on December 27, 2000.  (Id. at 55.)  On October 11, 2001, after the CARDS agreement had been in place for almost a year, Defendant Chenery Associates emailed Curtis to ask whether it wanted to renew the CARDS financing for the upcoming year.  Curtis informed Defendants that it wished to renew financing with HVB.

On November 13, 2001, HVB exercised its right under the Credit Agreement to demand repayment.  HVB notified Curtis "that it had decided that the entire outstanding principal amount on the loan would become due and payable on

December 14, 2001."[5]  (Id. at ¶ 61.)  Curtis alleges that on the same day, Chenery advised it "HVB would set the new spread so high as to preclude [Curtis] from continuing the [CARDS] financing."  (Id. at ¶ 62.)  On December 14, 2001, Curtis repaid the CARDS loan in full.  (Id. at ¶ 68.)

Curtis alleges that forced early repayment damaged it by destroying the tax and investment advantages for which Curtis had entered into the CARDS transaction.  Curtis specifically alleges it "was forced to scramble to find a last-minute replacement for its CARDS loan on terms less favorable than the original financing and . . . the IRS determined that CARDS was a 'sham' and demanded that Plaintiff . . . pay back taxes, interest, and penalties for the year 2000."  (Id. at ¶ 34.)

On May 6, 2005, the IRS disallowed the nearly $28 million short-term capital gains loss Curtis had reported from CARDS loan, and assessed tax adjustments and penalties for incorrect and inadequate tax reporting.  The IRS determined that Curtis had "no legitimate business purpose" for entering into the

───────────────

[5]  The narrative of the Amended Complaint suggests that after the Assumption Agreement was signed, Curtis shouldered all of the Credit Agreement's obligations and was treated as the real party in interest for the loan. Brondesbury does not appear from the pleadings to have had any meaningful further role in making decisions related to the CARDS loan.

CARDS loan.  (<u>Id.</u> at Ex. C.)  Curtis alleges the IRS reached this conclusion based on the erroneous assumption that Curtis and the Defendants intended to unwind the CARDS arrangement after only one year.  (<u>Id.</u>)  The parties do not dispute that the IRS has concluded that the CARDS loan is a fraudulent tax shelter scheme, nor do they dispute that the IRS has concluded that all parties to the CARDS loan, including the ultimate borrower, knew the transaction was intended to be  unwound after only one year.

Curtis disputes the IRS's conclusion, contending it intended the CARDS loan to last for 30 years and that it suffered damages when the loan was terminated after only one year. (<u>Id.</u> at  ¶ 69.)  Curtis claims the 30-year term was essential to realize the investment and tax advantages of CARDS.  (<u>Id.</u> at ¶¶ 62. 69.)

On February 14, 2006, HVB signed a "Deferred Prosecution Agreement" ("DPA") with the United States Department of Justice.  Curtis contends the DPA shows "Defendants had purposefully misrepresented their intent to provide [Curtis] with 30-year financing."  (<u>Id.</u> at ¶ 72.), specifically that Defendants fraudulently promoted the CARDS loan as a 30-year transaction, "knowing full well that no Defendant intended the financing to continue past the end of December 2001."  (<u>Id.</u> at ¶¶ 73-75.)  Curtis claims all Defendants in this action knew that the

-7-

representations of a 30-year loan term were false at the time they were made.  (Id. at ¶¶ 77-79.)

On November 9. 2006, Curtis filed the present suit against eighteen defendants connected to the CARDS transaction, alleging that the various misrepresentations about the length of the loan term fraudulently induced it into participating in the transaction.  The Amended Complaint specifically states, "both the financial success of the [CARDS] transaction and the tax benefits depended almost entirely on Defendants structuring the transaction such that Plaintiff . . . could profit from favorable 30-year financing."  (Id. at ¶ 33.)  Curtis alleges it was told that "one of the economic benefits of the CARDS transaction included that [Curtis] could 'apply the [CARDS] loan proceeds to an investment/business with the reasonable expectation of earning a greater return than the all-in cost of the loan."  (Id. at ¶ 43.)  Curtis alleges it "would not have invested in CARDS if it had known it would be unable to amortize the substantial up-front cost of the transaction over the 30-year term of the loan, which was an integral part of the CARDS transaction."  (Id. at ¶ 33), and that it was told, "the rate ultimately realized by [Curtis] would be exceptional, assuming the . . . up-front fees and costs were amortized over the 30-year term of the loan."  (Id. at ¶ 46.)  "This reasonable

expectation of profit was key to the success of CARDS from both a business and tax perspective."  (Id. at ¶ 50.)

Curtis claims it conducted its own due diligence research, and, additionally, that Sidley provided a legal opinion concluding "CARDS would 'more likely than not' provide the favorable tax treatment. . . ."  (Id. at ¶¶ 44; 47.)  Sidley's opinion was allegedly based, "among other things, on [Curtis's] determination that it reasonably expected to profit from the [CARDS] loan over the course of the investment."  (Id. at ¶ 51.)

Curtis alleges the Defendants made various representations that the CARDS loan would be maintained for 30 years, based on which Curtis agreed to enter into the transaction.  "CARDS would not be profitable to [Curtis] on a short-term basis."  (Id. at ¶¶ 52, 54.)  Despite the Credit Agreement's specific reservation of HVB's right to demand repayment annually, Curtis alleges, "Defendants persuaded [Curtis] that HVB would not demand prepayment of the [CARDS] loan. Defendants HVB, Hahn, and Chenery Associates repeatedly represented to [Curtis] that CARDS was a 30-year commercial financing transaction and that Defendant HVB had no intention of demanding prepayment."  (Id. at ¶ 53.)

Curtis's complaint asserts claims for treble damages and attorneys fees under the federal Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961 et. seq., ("RICO"), and claims for treble damages, punitive damages, and attorneys fees under the Georgia Racketeer Influenced Corrupt Organizations Act, O.C.G.A. § 16-14-1 et. seq., ("Georgia RICO").  Curtis also asserts a claim of common law fraud, and a claim for breach of duty of good faith and fair dealing against HVB.

On March 23, 2007, in response to motions to dismiss from various defendants, Curtis filed an Amended Complaint.  The Amended Complaint reasserted Curtis's claims under RICO and Georgia RICO, adding more detailed allegations concerning the nature of the alleged enterprise and predicate acts in an attempt to overcome the motions to dismiss.  Curtis's amended RICO claims specified that the Defendants acted together as an enterprise with a common purpose:

> to bill and collect millions of dollars with of fees for alleged commercial lending, legal, and accounting services by offering fraudulent commercial loan deals, which were represented to be long-term commercial financing transactions with attendant tax benefits, when, in fact, the Defendants had no intent to provide long-term financing.  The organization had an ascertainable structure in which each Defendant played a particular operational or managerial role.

(Id. at ¶ 82.)

-10-

The Amended Complaint asserts that the pattern of racketeering activity conducted by this enterprise included multiple instances of mail fraud and wire fraud.  The Amended Complaint also reasserted Curtis's claims for common law fraud and for breach of duty of good faith and fair dealing.

## II.   DISCUSSION

Dismissal of a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) is appropriate "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action."  Marshall County Bd. of Educ. v. Marshall County Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993).  "Although a plaintiff is not held to a very high standard in a motion to dismiss for failure to state a claim, some minimal pleading standard does exist."  Wagner v. Daewoo Heavy Indus. Am. Corp., 289 F.3d 1268, 1270 (11th Cir. 2002), rev'd on other grounds, 314 F.3d 541 (11th Cir. 2002) (en banc).  "To survive a motion to dismiss, plaintiffs must do more than merely state legal conclusions; they are required to allege some specific factual bases for those conclusions or face dismissal of their claims."  Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1263 (11th Cir. 2004) ("[C]onclusory allegations, unwarranted

deductions of facts or legal conclusions masquerading as facts will not prevent dismissal.") (citations omitted).

In considering a defendant's motion to dismiss, the court accepts the plaintiff's allegations as true, Hishon v. King & Spalding, 467 U.S. 69, 73 (1984), and construes the complaint in the plaintiff's favor. Duke v. Cleland, 5 F.3d 1399, 1402 (11th Cir. 1993). To survive a motion to dismiss, a complaint is not required to contain "detailed factual allegations," but must "give the defendant fair notice of what the claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1964 (2007). Ultimately, the complaint is required to contain "enough facts to state a claim to relief that is plausible on its face." Id. at 1974.

A.    Summary of Holdings

Defendants filed individual motions to dismiss that raise independent and overlapping arguments. In some instances, Defendants mutually or unilaterally adopted each other's arguments. The motions each raise multiple grounds for dismissing various of Curtis's claims. Wading through the often duplicative arguments presented by Defendants was time consuming.[6]

_____

[6] In circumstances like these, the Court encourages the parties to request a meeting with the Court to discuss how best to avoid overlapping and redundant

After carefully reviewing the arguments presented, the Court finds that the Amended Complaint is required to be dismissed for multiple reasons, discussed in greater detail below.  Because of the complex structure of the multi-party/multi-argument briefing, the Court summarizes its findings as follows:.

- • Curtis's RICO claims are dismissed as:
  - • barred by the doctrine of merger
  - • barred by the statute of limitations and not tolled
  - • precluded by failure to allege predicate acts of common law, mail, and wire fraud with sufficient specificity

- • Curtis's Georgia RICO claims are dismissed as:
  - • barred by the doctrine of merger
  - • precluded by failure to allege predicate acts of common law, mail, and wire fraud with sufficient specificity

- • Curtis's common law fraud claims are dismissed as:
  - • barred by the doctrine of merger
  - • barred by the statute of limitations and not tolled
  - • precluded by failure to allege fraud with sufficient specificity

- • Curtis's claim against HBV for breach of the duty of good faith and fair dealing is not sustainable in the face of the Credit Agreement

- • Curtis's claims against Leboeuf are dismissed for lack of personal jurisdiction

The Court sets forth below its reasoning for reaching these conclusions.

---

briefing.

B.    Jurisdiction for Defendants Sidley and Leboeuf

Defendants Sidley and Leboeuf claim this Court does not have personal jurisdiction over them.  In the absence of the federal RICO claim,[7] the Court's jurisdiction exists solely in diversity.  "In a diversity action, a federal court has personal jurisdiction over a non-resident defendant to the extent permitted by the forum state's long-arm statute."  Nippon Credit Bank, Ltd. v. Matthews, 291 F.3d 738, 746 (11th Cir. 2002).

A plaintiff must establish a prima facie case of jurisdiction to survive a motion to dismiss.  Francosteel Corp. v. M/V Charm, 19 F.3d 624, 626 (11th Cir. 1994).  "In the Eleventh Circuit, a determination of personal jurisdiction requires consideration of both the Georgia long-arm statute and the Due Process Clause of the United States Constitution."  Paul, Hastings, Janofsky & Walker, LLP v. City of Tulsa, OK, 145 F. Supp. 2d 1248, 1253 (N.D. Ga. 2002).  The Georgia long-arm statute provides that a court:

> may exercise personal jurisdiction over any
> nonresident . . . as to a cause of action arising from any of
> the acts, omissions, ownership, use, or possession
> enumerated in this Code section, in the same manner as if

---

[7]  Curtis's federal RICO claim must be dismissed for reasons discussed more fully below.

he were a resident of the state, if in person or through an agent, he:

(1) Transacts any business within this state;

(2) Commits a tortious act or omission within this state . . . ,

(3) Commits a tortious injury in this state caused by an act or omission outside this state if the tort-feasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state;

(4) owns, uses, or possesses any real property situated within this state;

O.C.G.A. § 9-10-91.

The "transacts business" prong of this statute permits the exercise of jurisdiction to the fullest extent permitted by the United States Constitution. Innovative Clinical & Consulting Servs., LLC v. First Nat. Bank, 620 S.E.2d 352, 354 (Ga. 2005).

Due process dictates that a nonresident defendant may be subject to personal jurisdiction only when "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985). "Due process contemplates two types of jurisdiction over the person: general and specific

jurisdiction."  Paul, Hastings, 245 F. Supp. 2d at 1253; see also Nippon Credit

Bank, Ltd. v. Matthews, 291 F.3d 738, 747 (11th Cir. 2002).

For general jurisdiction to apply, a nonresident defendant's "contacts with

the forum that are unrelated to the litigation must be substantial," in the nature of

"continuous and systematic general business contracts between the defendant and

the forum state."  Meier v. Sun Int'l Hotels, Ltd., 288 F.3d 1264, 1274 (11th Cir.

2002).  Specific jurisdiction occurs if the defendant's contacts with the forum state

are "related to the plaintiff's cause of action or have given rise to it; they must

involve some act by which the defendant purposefully avails itself of the privilege

of conducting activities within the forum, and they must be such that the defendant

should reasonably anticipate being haled into court there."  Sloss Indus. Corp. v.

Eurisol, 488 F.3d 922, 925 (11th Cir. 2007).

Jurisdiction must also comport with "traditional notions of fair play and

substantial justice," which involves consideration of: "(a) the burden on the

defendant, (b) the forum State's interest in adjudicating the dispute, (c) the

plaintiff's interest in obtaining convenient and effective relief, (d) the interstate

justice system's interest in obtaining the most efficient resolution of controversies,

and (e) the shared interest of the several States in furthering substantive social

policies.  <u>Meier</u>, 288 F.3d at 1276.

>    1.    *Sidley*

Sidley is a law firm headquartered in New York.  Sidley does not have

any offices in Georgia, and none of its partners reside here.  The Amended

Complaint states Sidley's involvement with the CARDS scheme was limited to

preparing and sending to Curtis a draft and final opinion letter stating that the

CARDS transaction was more likely than not to provide certain tax and investment

benefits.

Sidley sent the opinion letter to Curtis, a Georgia resident, in Georgia, and

accepted payment in return.  This constitutes transacting business in Georgia for

the purposes of the Georgia long-arm statute, and jurisdiction is proper so long as

the requirements of due process are otherwise satisfied.

The Court cannot, consistent with due process, exercise general jurisdiction

over Sidley.  The Amended Complaint does not allege any continuous and

systematic business contacts between Sidley and Georgia.  Sidley argues, and

Curtis does not dispute, that its contacts with Georgia generally have been limited

to the occasional representation of clients in Georgia, in matters wholly unrelated to Curtis or this lawsuit.

The exercise of specific jurisdiction over Sidley is, however, consistent with the requirements of due process. Sidley's contacts with Georgia are related to Curtis's cause of action. Sidley purposefully directed the opinion letter to Curtis in Georgia for the purpose of facilitating and advancing the CARDS transaction. This level of contact is sufficient for the Court to exercise jurisdiction over Sidley for claims relating to the CARDS transaction. Further, legal opinion letters are significant pieces of work, drafted with the express purpose of providing a basis for parties to make business and legal decisions. Lawyers drafting opinion letters are not infrequently drawn into discovery disputes if the client relies on the opinion letter in litigation, creating a broad subject-matter waiver of all communications between the client and the attorney. If Sidley's legal opinion letter was insufficient, Curtis could likely sue for malpractice in Georgia. Sidley should have reasonably anticipated being haled into court in Georgia based on the opinion letter. This Court's exercise of personal jurisdiction over it for this matter is appropriate.

-18-

2.    *Leboeuf*

Leboeuf is a non-resident Defendant headquartered in New York.  Leboeuf has no officers, partners, employees, or property in Georgia.  Leboeuf was not a signatory to any of the CARDS documents, and is not alleged to have had any direct communications with Curtis regarding CARDS.  Curtis alleges that Leboeuf, "acting in their role as counsel to Brondesbury, LLC had knowledge of the [CARDS] transaction, were an integral part of the structure of Defendants' Racketeering Enterprise, and prepared documents and made representations necessary to the perpetration of the scheme to defraud."  (Amd. Compl. at ¶ 77.)  Curtis, in its response to Leboeuf's motion to dismiss, admits that Leboeuf has no "direct" contacts with it or the state of Georgia.

Assuming *arguendo* that Leboeuf's alleged participation in the CARDS scheme constituted either the transaction of business or the commission of a tort in Georgia, exercising jurisdiction over Leboeuf would violate due process.  General jurisdiction cannot be exercised because Leboeuf is not alleged to have continuous and systematic contacts with Georgia.

The exercise of specific jurisdiction is also not appropriate.  Leboeuf is not alleged to have made any direct contact with Curtis or with any other party in the

state of Georgia.  Leboeuf is alleged only to have advised other parties, none of

whom are Georgia residents, regarding their roles in the CARDS transaction.

Curtis does not allege any fact that would show Leboeuf purposefully availed itself

of the protections of Georgia law, as the agreements at issue in the CARDS

transaction were governed by New York law, and Leboeuf's client Brondesbury

was a New York corporation.  In the absence of any allegations showing contacts

between Leboeuf and Curtis or Leboeuf and Georgia, this Court cannot exercise of

jurisdiction over it.[8]

---

[8]   Curtis argues that Leboeuf's involvement in a fraud conspiracy targeted at
Georgia establishes jurisdiction.  Members of an alleged conspiracy must each be
shown to have sufficient contacts with the forum state to satisfy due process.
Coopers & Lybrand v. Cocklereece, 276 S.E.2d 845, 849-50 (Ga. Ct. App. 1981)
("the bare existence of a conspiracy is not enough to support long-arm jurisdiction
without a further showing of a 'contact' with the forum jurisdiction . . . . [A]
nonresident must have some contact with the forum itself and not just a connection
with the resident plaintiff.") (citations and quotations omitted).
    Even under the "conspiracy theory" of jurisdiction, embraced by some
courts in this district, Curtis must show some level of relationship between the out
of state defendant, the conspiracy, and the state of Georgia.  McDonald v. St.
Joseph's Hospital of Atlanta, Inc., 574 F. Supp. 123, 127-28 (N.D. Ga. 1983)
Assuming *arguendo* that Curtis has sufficiently alleged a conspiracy that has
minimum contacts with the state of Georgia (which, as noted elsewhere, it has not),
the Amended Complaint does not state facts that establish a sufficient connection
between Leboeuf and that alleged conspiracy for this Court to exercise jurisdiction
over Leboeuf, which is alleged only to have an ambiguous role advising
Brondesbury.

C.    Merger

Defendants argue that Curtis's common law fraud, RICO, and Georgia

RICO claims are barred by the doctrine of merger.  Under Georgia law, a

contracting party may not assert fraud based on oral representations that contradict

the terms of an integrated contract.  First Data POS, Inc. v. Willis, 546 S.E.2d 781,

794 (Ga. 2001).  Prior or contemporaneous oral agreements "cannot be used to

vary the terms of the valid written agreement purporting to contain the entire

agreement of the parties, *nor would such violation of any such oral agreement*

*amount to actionable fraud*." Campbell v. Citizens & Southern Nat. Bank, 415

S.E.2d 193 (Ga. Ct. App. 1992) (emphasis added).[9]  Reasonable reliance is an

essential element of common law fraud.  See Tankersley v. Barker, 651 S.E.2d

435, 437 n.1 (Ga. Ct. App. 2007).  Mail and wire fraud require misrepresentations

"reasonably calculated to deceive persons of ordinary prudence and

_____

        [9] New York law, which governs the Credit Agreement and Assumption
Agreement, is similar.  See General Bank v. Mark II Imports, Inc., 293 A.D.2d 328
(N.Y. App. Div. 2002) ("The guarantors' claim that they were fraudulently induced
to enter into the subject lending relationship by plaintiff's promise to eliminate the
'borrowing cap' on advances to the borrower is, as a matter of law, foreclosed by
an integration clause . . . ."); Coutts Bank (Switzerland) Ltd. v. Anatian, 261
A.D.2d 307 (N.Y. App. Div. 1999) (holding that reliance on alleged prior oral
representations related to loan agreement is unreasonable as a matter of law when
in conflict with the express provisions of the credit agreement, and cannot support
allegations of fraud in the inducement).

comprehension." <u>Pelletier v. Zweiffel</u>, 921 F.2d 1465, 1498-99 (11th Cir. 1991) (citation and quotation omitted).

The Credit Agreement is an integrated contract. "This Agreement . . . contains the entire agreement between the parties with respect to the subject matter hereof and supercedes all oral statements and prior writings with respect hereto." (Agreement, ¶ 10.19).[10]   It is undisputed that the Agreement also expressly gives HVB the right to demand full repayment at the end of each loan year. (Amd. Compl. at ¶¶ 45, 53, 59-61.)

Curtis argues the Credit Agreement was entered into by Brondesbury, and thus Curtis is not bound by its integration clause. It is undisputed, however, that Curtis entered into the Assumption Agreement, in which it agreed "to comply with each of the covenants and agreements of the Borrower in the Credit Agreement on a joint and several basis with the Borrower as if the references therein to the Borrower were references to [it]." (Assumption Agreement, § 1.) The Assumption Agreement expressly incorporates the entirety of the Credit Agreement, including

---

[10]   Even though the Agreement was not attached to the complaint or amended complaint, the Court may consider any documents "the plaintiffs either possessed or knew about and upon which they relied in bringing suit." <u>Rothman v. Gregor</u>, 220 F.3d 81, 88 (2d. Cir. 2000). <u>See also</u> <u>Brooks v. Blue Cross & Blue Shield of Fla., Inc.</u>, 116 F.3d 1364, 1368-69 (11th Cir. 1997).

the integration clause.  See, Walls, Inc. v. Atlantic Realty Co., 367 S.E.2d 278 (Ga.

Ct. App. 1988) (noting that when one contract assumes the terms of another, the

terms of the assumed contract become part of the assuming contract).  Curtis has

not presented any authority for the proposition that a categorical assumption

agreement does not bind the signer to a merger clause executed in the assumed

agreement.

Curtis, knowing that the Assumption Agreement bound it to the terms of the

integrated Credit Agreement, could reasonably rely only on the express terms of

the Credit Agreement itself, which gave HVB the right to demand full repayment

annually.  Curtis could not, in other words, reasonably rely on allegedly fraudulent

representations the loan would necessarily be held for 30 years when the express

terms of the Credit Agreement allowed HVB, in its sole discretion, to demand

repayment prior to that.[11]  Any prior or contemporaneous representations that the

---

[11]  The lack of reasonable reliance created by the merger clause extends to
any representations made by other Defendants in this case both individually and to
the extent they are alleged to have acted as members of a conspiracy.  See, e.g.,
Markowitz v. Wieland, 532 S.E.2d 705 (Ga. Ct. App. 2000).  In the face of the
clear language of the Credit Agreement, it was simply unreasonable for Curtis to
rely on any statement by any defendant that HVB would not exercise the
repayment rights specifically reserved to it in the Credit Agreement.  If Curtis, a
sophisticated investment firm, wanted a 30-year loan term, it could have negotiated
a different repayment clause or expressly excluded the Credit Agreement's
mandatory repayment clause from the Assumption Agreement.

loan would necessarily be maintained for 30 years are contradicted by the express terms of the Credit Agreement.  Curtis could not reasonably rely on any such representations, and, in light of the express language of the Credit Agreement, such representations were not reasonably calculated to deceive a person of "ordinary prudence and comprehension."  Curtis's claims for common law fraud, RICO, and Georgia RICO must therefore be dismissed.[12]

>    D.    RICO

>         1.    *Statute of Limitations*

Defendants alternatively move to dismiss the federal RICO claim because it is barred by the statutes of limitation.[13]  Dismissing a claim as barred by a statute of limitations "is appropriate only if it is apparent from the face of the complaint that

---

[12]  Curtis's suggestion that it can maintain a claim for fraudulent inducement despite the merger clause is misplaced.  Where a complaint, like the Amended Complaint here, asserts fraud and does not include a claim for rescission, the plaintiff has elected to affirm the contract.  See, Ainsworth v. Perreault, 563 S.E.2d 135, 137-38 (Ga. Ct. App. 2002).  If the contract contains a merger clause, and the plaintiff has affirmed the contract, its fraudulent inducement claim fails.  Donchi, Inc. v. Robdol, LLC, 640 S.E.2d 719, 721-22 (Ga. Ct. App. 2007).

[12]  Curtis's Georgia RICO and RICO claims depend entirely on allegations of mail and wire fraud, the essence of which was an attempt to convince Curtis that the CARDS loan would have a 30-year term.

[13]  The parties agree that the Georgia RICO claims are not barred by the statute of limitations.

the claim is time-barred," and then "only if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute."  Tello v. Dean Witter Reynolds, Inc., 410 F.3d 1275, 1288 and n.13 (11th Cir. 2005) (quotation and citation omitted.

Although RICO does not include an express statute of limitations, the Supreme Court has held that RICO's civil enforcement provisions are subject to a four-year limitations period.  Agency Holding Corp. v. Malley-Duff & Assoc., Inc., 483 U.S. 143, 152-53 (1987).  The civil RICO limitations period runs from the moment a diligent plaintiff discovered or should have discovered an injury to itself, not from the time it discovered the pattern of predicate acts.  Rotella v. Wood, 528 U.S. 549, 558-59 (2000).

Once the limitations period starts to run, a later-occurring predicate act does not restart it.  Klehr v. A.O. Smith Corp., 521 U.S. 179, 187-88 (1997).  The limitations period for a later-occurring predicate act accrues separately only if the later act inflicts a "new and independent" injury,  and not a mere continuation of the initial injury.  Pilkington v. United Airlines, 112 F.3d 1532, 1537-38 (11th Cir. 1997).  A plaintiff cannot "use an independent, new predicate act to act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside of the limitations period."  Klehr, 521 U.S. at 190.

RICO is subject to equitable tolling.  <u>Rotella</u>, 528 U.S. at 562.  Tolling is "exceptional," and is not applied simply because the alleged predicate acts are fraudulent, complex, or concealed.  <u>Pacific Harbor Capital, Inc. v. Barnett Bank, N.A.</u>, 252 F.3d 1246, 1251-52 (11th Cir. 2001).  Equitable tolling "is defeated . . . when it is shown that indisputably the plaintiffs had sufficient notice to prompt them to investigate and that, had they done so diligently, they would have discovered the basis for their claims."  <u>Id.</u> quoting <u>Morton's Market, Inc. v. Gustafson's Dairy, Inc.</u>, 198 F.3d 823, 832 (11th Cir. 1999).  "The protection of the non-diligent plaintiff is not the rule in RICO cases.  <u>Pacific Harbor</u>, 252 F.3d at 1252.

Defendants argue that Curtis knew it had been injured under RICO by December 14, 2001, at the latest.  Curtis entered into the CARDS loan in December of 2000.  On November 13, 2001, Defendants HVB and Chenery Associates demanded repayment of the entire loan balance by December 14, 2001, which, Curtis alleges, was "directly contrary to Defendants' representations that CARDS was premised on a 30-year loan transaction . . . ." (Amd. Compl. at ¶ 63.)  On December 14, 2001, Curtis repaid the loan balance.  Curtis further alleges that by December 14, 2001, after "scrambling" to find new financing, it knew it would

not be able to find comparable financing on equally favorable terms.  Also around this time, Curtis alleges that Chenery Associates submitted a letter, bordering on extortionate, that stated, "HVB would set the new spread so high as to preclude [Curtis] from continuing the . . . financing."  (Id. at ¶ 62.)

Curtis first suffered harm no later than December 14, 2001.  The Amended Complaint emphasizes repeatedly that the 30-year duration of the CARDS loan was a critical component to its anticipated profitability.  The Amended Complaint states that both the commercial and tax advantages of the CARDS loan relied on its 30-year scope, and that Curtis would not have agreed to enter a short-term CARDS loan.  Curtis alleges that early repayment destroyed the benefits it anticipated from the CARDS arrangement.  Taking the allegations of the Amended Complaint as true, Curtis's RICO claim first accrued by December 14, 2001, at the latest.

Curtis contends that an issue of fact exists regarding whether the RICO limitations period should be equitably tolled.  Curtis raises three arguments.  First, Curtis argues that on December 14, 2001, it "did not then know, and could not reasonably have known, that Defendants had fraudulently misrepresented the CARDS transaction such that Defendants *never* intended to provide 30 years of financing, as promised."  (Pls. Resp. at 13.)  Curtis argues that Defendants'

fraudulent intent at the time of contracting remained concealed until February 13, 2006, when Curtis was given access to the DPA.  Second, Curtis argues it did not know of the full extent of its injury until May 6, 2005, when the IRS informed it that it would seek tax adjustments and penalties.  Third, Curtis contends that separately accruing RICO predicate acts occurred within four years of the date Curtis filed suit, specifically the IRS's demand for taxes and penalties.

Curtis's arguments do change the indisputable facts, which demonstrate conclusively that tolling is not appropriate.  RICO claims–even when based on fraud or on complex facts from which the harm is difficult to discover–accrue from the first date that the harm would have been discovered by a diligent plaintiff.  It is undisputed that Curtis actually incurred and knew of the harm at issue in this case on December 14, 2001, when it repaid the entire CARDS loan amount.  At that point, according to the Amended Complaint, Curtis knew it had lost both the investment and tax advantages it intended to gain from the CARDS loan.  Even if Curtis did not, as it claims, know of HVB's fraudulent intent at the time of contracting, Curtis had actual knowledge in 2001 of HVB's alleged breach of its promises and of the harm that would ensue.  The Amended Complaint repeatedly and emphatically states that the demanded early repayment violated multiple

-28-

representations by HVB and other defendants.  Knowledge that HVB intended to break its alleged promises to maintain the loan for 30 years was enough to prompt a diligent plaintiff to begin investigating.

The circumstances of the alleged breach of Defendants' promises was certainly sufficient to put a reasonably diligent plaintiff on notice that it should investigate why the CARDS loan was being called by HVB after only one year. See, Coffee v. General Motors Acceptance Corp., 30 F. Supp. 2d 1376, 1381 (S.D. Ga. 1998).  For example, prior to December 14, Chenery Associates sent Curtis a letter stating that HVB intended to set the spread so high that Curtis would be forced out of the CARDS loan.  This letter suggests directly that HVB had always intended to violate the 30-year agreement Curtis alleges.  The letter further suggests that HVB, Chenery Associates, and other Defendants involved in the CARDS transaction were at that time, and perhaps from the beginning, operating in concert and in bad faith.  The letter alone would have put a reasonably diligent plaintiff on notice that investigation was necessary.  Taking Curtis's allegations as true, HVB's decision to demand repayment of the CARDS loan, coupled with the Chenery Associates letter, should have raised the specter of fraud, conspiracy, and damages in the mind of any reasonable plaintiff, and should have resulted in an

immediate inquiry into Defendants' conduct and intentions.  Equitable tolling is

not appropriate here.

The fact that the IRS waited until 2005 to demand taxes and penalties from

Curtis does not create a "new injury" tolling the RICO limitations period.  On the

face of the Amended Complaint, Curtis knew in 2001 it had lost the tax and other

benefits it expected from the CARDS transaction.  Curtis owed–and, according to

its allegations, knew it owed–taxes at the moment it repaid the CARDS loan in

2001.  This harm is not new and independent, but naturally follows from the

alleged harm of early repayment.  Curtis has not alleged a single new harm,

unrelated to the early repayment, that caused harm "over and above" that caused by

the early repayment.  <u>Klehr</u>, 521 U.S. at 190.  The fact that the IRS did not

discover Curtis's tax liability until 2005 does not affect the date on which the

injury occurred, and does not toll the limitations period.[14]

---

[14]  The Court finds other compelling policy reasons for this conclusion.  If
the Court tolled the statute of limitations in cases like this, it would permit
plaintiffs in similar cases to withhold filing suit in an effort to conceal tax liability
from the IRS without concern for the limitations period.  If the IRS later
discovered the existence of liability and pursued payment, the plaintiff could then
(having nothing more to lose) file suit and argue that the limitations period was
tolled by the IRS's delay in enforcement.  The Court declines to permit a tolling
argument that encourages and rewards attempts to evade the IRS's reporting
requirements.

2.    *Sufficiency*[15]

Defendants alternatively argue that Curtis's federal RICO claims should be dismissed as insufficient: (i) because the Private Securities Litigation Reform Act ("PSLRA") prohibits plaintiffs from filing RICO claims based on securities fraud; and (ii) because Curtis fails to allege an "enterprise."  Because Curtis's RICO Claims are required to be dismissed on the grounds of merger, statute of limitations, and, as set forth below, Rule 9(b) insufficiency, the Court will not address these arguments in detail other than to note that an issue of fact exists regarding whether this case should have been brought under the PSLRA.  It is not clear from the pleadings whether the "collateral" used in the CARDS transaction was currency or a promissory note.  If the collateral was a promissory note, that note was likely a "security" within the scope of the PSLRA.  See, Reves v. Ernst & Young, 494 U.S. 56, 65 (1990).

---

[15]  Defendants Sidley and Degiorgio argue that the Amended Complaint does not sufficiently allege facts showing that they committed fraud or were engaged in a conspiracy to defraud.  Because the Court finds Curtis's RICO and common fraud claims generally insufficient on multiple grounds, it does not address these Defendants' specific sufficiency arguments.

E.    Fraud

Defendants next argue that, even if Curtis's common law fraud claim is not barred by the doctrine of merger, it is precluded by the statute of limitations.  For the reasons set forth below, the Court agrees.

Under Georgia law, fraud claims must be brought within four years of the time the right of action accrues.  O.C.G.A. § 9-3-31.  The limitations period begins on the date the plaintiff sustains actual damages from the fraud.  Green v. White, 494 S.E.2d 681, 685 (Ga. Ct. App. 1997).  The clock runs from the date of the first injury, and the "cause of action arises . . . before the client sustains all, or even the greater part of the damages . . . ."  Jankowski v. Taylor, Bishop & Lee, 273 S.E.2d 16, 17 (Ga. 1980).

The statute of limitations for fraud claims is tolled only if the defendant engages in intentional concealment of the fraud that "debars or deters" the plaintiff's filing of the lawsuit.  O.C.G.A. § 9-3-96.  To toll a statute of limitations for fraud, a plaintiff must show:

> (1) actual fraud on the part of the defendant involving moral turpitude, (2) which conceals the existence of the cause of action from the plaintiff, and (3) plaintiff's reasonable diligence in discovering his cause of action, despite his failure to do so within the time of the applicable statute of limitations.

-32-

McClung Survering, Inc. v. Worl, 541 S.E.2d 703, 706 (Ga. Ct. App. 2000).
In other words, to toll the limitations period for fraudulent concealment, the
defendant must, "lull [plaintiff]] to sleep . . . ." Jones v. Bd. of Regents of Univ.
Sys. of Ga., 466 S.E.2d 869, 871 (Ga. Ct. App. 1995). If fraud is the gravamen of
the action, "the statute of limitations is tolled until the fraud is discovered or by
reasonable diligence should have been discovered," and "[n]o other independent
fraudulent act is required to toll the statute." Shipman v. Horizon Corp., 267
S.E.2d 244, 246 (Ga. 1980). If a relationship of "trust and confidence" exists
between the parties, "[f]ailure to exercise reasonable diligence to discover the fraud
may be excused . . . ."

    The limitations period for Curtis's fraud claim began to run, at the latest, on
December 14, 2001, when Curtis suffered alleged harm from repaying the CARDS
loan after only one year. This limitations period is only tolled if Curtis could not
have discovered the fraud through reasonable diligence, or if Defendants engaged
in further actual fraud that deterred and debarred Curtis from bringing suit. Curtis
has not pled facts sufficient to show the existence of either circumstance.

    In December of 2001, at the time of the alleged harm, Curtis knew that
Defendants had reneged on their purported promise to maintain the CARDS

financing for 30 years.  A little more than a year after Curtis alleges multiple

representations were made concerning the loan's 30-year scope, and not even a

year after the Credit Agreement and Assumption Agreement were executed, Curtis

alleges HVB purposefully breached its representations.  In these circumstances,

any corporation exercising ordinary diligence would begin to investigate the

possibility of fraud.  The mere fact that Curtis alleges it only later learned that

HVB did not intend to keep its promises from the outset does not relieve Curtis of

its responsibility to investigate diligently when it first discovered that HVB

intended to break those promises.  See, Coffee v. General Motors Acceptance

Corp., 30 F. Supp. 2d 1376, 1381 (S.D. Ga. 1998) (holding that "Plaintiffs had

actual or at least constructive knowledge that something was wrong when

Defendant [breached] . . . . [I]f Plaintiffs exercised due diligence, they would have

discovered the fraud they allege–that Defendant did not intend to fulfill the [terms

of the contract].").  And, if HVB's decision to demand early repayment were not

sufficient to prompt a diligent plaintiff to investigate, Curtis also received a letter

from Chenery Associates stating that HVB intended to set the CARDS spread

unreasonably high for the purpose of forcing Curtis to exit the loan.  This letter

would prompt any reasonable party to investigate not only the possibility of fraud,

but the possibility of conspiracy.  There was no relationship of special trust between Curtis and Chenery or Curtis and HVB, and Curtis has not made any showing that it could not have discovered the fraud alleged if it had exercised due diligence in 2001.  Tolling of the limitations period is not appropriate.

Curtis has further failed to show that any Defendant engaged in a fraud involving moral turpitude that "lulled it to sleep" or otherwise deterred it from bringing suit.  Curtis alleges that HVB concealed information from the IRS until 2005.  On the face of the pleadings, however, Curtis had actual knowledge in 2001 of both the fraud and the harm, when HVB forced it to unwind the CARDS transaction and Chenery Associates threatened it with an unreasonable spread rate. Despite HVB's alleged concealment of knowledge from the IRS, Curtis knew in 2001 that it would not be able to find advantageous substitute financing to help it retain its investment or tax advantages.  Even if HVB concealed its activities from the IRS, the Amended Complaint states unambiguously that Curtis knew that HVB had breached its alleged promises in 2001, and further knew of the damages that would result from that breach.

F.    Rule 9(b) Sufficiency

Defendants Sidley and Degiorgio alternatively argue that, even if Curtis's RICO, Georgia RICO, and common law fraud claims are not barred by merger or statutes of limitations, they must be dismissed because they are not pled with sufficient particularity under Federal Rule of Civil Procedure 9(b).

Federal Rule of Civil Procedure 9(b) sets forth heightened standards for fraud pleading, requiring that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."  This requirement is satisfied if the complaint sets forth "(1) precisely what statements were made in what documents . . .; (2) the time and place of each such statement and the person responsible for making [them]; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendants obtained as a consequence of the fraud."  Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1371 (11th Cir. 1997) (citations and quotations omitted).  "Because fair notice is perhaps the most basic consideration underlying Rule 9(b), the plaintiff who pleads fraud must reasonably notify the defendants of their purported role in the scheme."  Id. at 1381 (quotations and citations omitted).

"[I]n a case involving multiple defendants . . . the complaint should inform each defendant of the nature of his alleged participation in the fraud." Id. (citation omitted). Pleadings are insufficient where they simply lump together all defendants and are "devoid of specific allegations with respect to the separate Defendants." Id. Rule 9(b) applies to allegations of wire and mail fraud as well as common law fraud. See, e.g., Durham v. Business Management Assoc., Inc., 847 F.2d 1505, 1511-12 (11th Cir. 1988).

Curtis argues the Amended Complaint alleges sufficiently particular statements of the fraudulent statements, mailings, or wire communications at issue. The Amended Complaint alleges the following specific misrepresentations:

(1)    "During either late November or early December, 2000, Defendants Hahn and Chenery Associates transmitted a PowerPoint presentation to [Curtis] by interstate mail . . . [stating] that the CARDS transaction provided economic and other advantages . . . ." including Curtis's ability to "apply the loan proceeds to an investment/business with the reasonable expectation of earning a greater return than the all-in cost of the loan." (Amd. Compl. at ¶¶ 42, 85(a).)

(2)     In October of 2000, Sidley forwarded a legal opinion stating "CARDS

        would 'more likely than not provide the favorable tax treatment described by

        Hahn,'" (<u>Id.</u> at ¶ 44, 82(b).)

(3)     That Hahn and Sidley represented "[t]hrough oral and written materials" that

        the CARDS transaction would have a term and maturity date of 30 years.

        (<u>Id.</u> at ¶ 45(a).)

(4)     That Hahn and Chenery Associates "represented that CARDS would provide

        [Curtis] with working capital for its investment business at a very favorable

        interest rate, such that [Curtis] could reasonably expect to generate a greater

        return than the all-in cost of the loan."  (<u>Id.</u> at ¶  46.)

(5)     "HVB, Hahn, and Chenery Associates repeatedly represented to [Curtis] that

        CARDS was a 30-year commercial financing transaction and that Defendant

        HVB had no intention of demanding prepayment."  (<u>Id.</u> at ¶ 53)

(6)     "Defendants sold CARDS to [Curtis] by fraudulently promoting it as a 30-

        year transaction, knowing full well that no Defendants intended the

        financing to continue past the end of December 2001" (<u>Id.</u> at ¶ 73)

(7)     "In the deferred prosecution agreement, HVB admitted . . . [it] falsely stated

        that the loans were 30 year loans whereas, in truth and fact, as HVB and

other participants knew and understood, they were loans of approximately

one year in duration." (Id. at ¶ 74.)

(8)   On December 27, 2000, DeGiorgio and HVB "caused Bank of America in

Atlanta, Georgia to prepare letters describing [Curtis's] creditworthiness and

to place said letters into the interstate mail for delivery to Defendant HVB"

(Id. at ¶ 83(c))

(9)   On January 15, 2001, HVB and Chenery "caused [Curtis] to transmit

approximately $2,163,228.00 by interstate wire transmission from Nations

Bank in Atlanta, Georgia to Defendants for payment of CARDS transaction

fees."  (Id. at ¶ 83(d).)

(10)   "As part of their conspiracy, each of the Defendants acted in concert with

each of the other Defendants as part of a planned and prearranged common

scheme to induce [Curtis] to pay millions of dollars in fees and charges in

order for [Curtis] to participate in the CARDS transaction . . . ."  (Id. at ¶¶

88, 98)

(11)    "Defendants conspired to represent and did represent that Defendant

HVB had a present intent to provide the 30-year long term financing on

which the CARDS transaction was predicated and which was permitted by

the CARDS transaction documents" (Id. at ¶ 105.)

After carefully reviewing the Amended Complaint, the Court finds that

Curtis's allegations, though numerous, are highly generalized.  Curtis only

identifies two specific written or oral representations that could be construed even

to imply that the CARDS loan would have a long term, and neither of these

representations states that the CARDS loan would necessarily be maintained for 30

years.  Curtis does not identify the who, what, when, and where of any specific

representation by any Defendant that HVB would maintain the loan for 30 years.[16]

Curtis alleges it received a PowerPoint from Chenery Associates stating that

it could apply the loan proceeds "with a reasonable expectation of earning a greater

return than the all-in cost of the loan."  Curtis also alleges that Sidley provided an

opinion letter stating "more likely than not" that the CARDS transaction would

provide the tax benefits represented.[17]  These representations imply that the

---

[16]  As noted more fully above, the Credit Agreement explicitly granted HBV the right to demand full repayment well prior to the 30-year maturity date.

[17]  The opinion letter operates on the assumption that the loan would be maintained for a 30-year term.  The opinion letter also expressly points out the possibility of prepayment scenarios.  Although this representation was pled with

CARDS loan was intended to be maintained long-term.  These representations do not state that the CARDS loan would necessarily be maintained for 30 years by HBV.

Defendants raised a Rule 9(b) argument in their motions to dismiss the original complaint.  Curtis filed the Amended Complaint to address these motions, but has failed to identify even one specific oral or written representation by any Defendant that the CARDS loan would be maintained by HVB for 30 years–the allegation at the heart of Curtis's case.  Curtis simply fails to plead the "who, what, when, and where" of the representations it claims were fraudulent, that is, the representations that HVB would maintain the loan for 30 years, despite its contractual right to demand repayment annually.  See, United States ex rel Clausen v. Lab Corp. of Am., Inc., 290 F.3d 1301, 1310 (11th Cir. 2002).  In the absence of sufficient particularity, Curtis's common law, wire, and mail fraud claims, and the RICO and Georgia RICO claims that depend on them, must fail.

    G.    <u>Good Faith and Fair Dealing</u>

The Credit Agreement is governed by New York law.  Under New York

---

specificity, it is not fraudulent.

law, "in every contract there exists an implied covenant of good faith and fair dealing." Outback/Empire I, Ltd. Partnership v. Kamitis, Inc., 35 A.D.3d 563, 563 (N.Y. App. Div. 2006). The implied duty of good faith when "the express terms may not have been technically breached, [but] one party has nonetheless effectively deprived the other of those express, explicitly bargained-for benefits." Metropolitan Life Ins. Co. v. RJR Nabisco, Inc., 716 F. Supp. 1504, 1517 (S.D.N.Y. 1989). The duty of good faith is breached "only when one party seeks to prevent the contract's performance or to withhold its benefits." Id.

"Where the contract contemplates the exercise of discretion," the duty of good faith "includes a promise not to act arbitrarily or irrationally in exercising that discretion." Wageworks, Inc. v. Metropolitan Transp. Authority, 839 N.Y.S.2d 437, 437 (N.Y. Sup. Ct. 2007). In other words, if an agreement grants one party rights "in its sole and absolute discretion," it is still "required to carry out its contractual obligations incident to the exercise of its discretion in good faith." Outback, 35 A.D.3d at 563. Determining whether an exercise of discretion occurs in good faith requires "judgments about personal good faith, belief, motive, and intent," and will "generally entail fact-intensive inquiries . . . ." Mickle v. Christie's, Inc., 207 F. Supp. 2d 237, 250 (S.D.N.Y. 2002).

The duty of good faith and fair dealing cannot, however, be asserted in a manner "inconsistent with other [express] terms of the contractual relationship." Wageworks, 839 N.Y.S.2d at 437, Murphy v. American Home Prods. Corp., 461 N.E.2d 86, 91 (N.Y. 1983).  In the context of financing agreements, New York courts specifically hold that "a financing institution does not act in bad faith when it exercises its contractual right to terminate financing."  Chrysler Credit Corp. v. Diguardi Jeep Eagle, Inc., 192 A.D.2d 1066, 1067 (N.Y. App. Div. 1993).

It is undisputed that the Credit Agreement grants HVB sole discretion to decide annually whether to demand repayment.  HVB argues it cannot be held liable for bad faith for exercising its express contractual rights.

Although New York law imputes a duty of good faith even to contractual grants of unilateral discretion, Curtis does not argue that HVB exercised its contractual right arbitrarily or irrationally.  Curtis instead argues, in essence, that HVB could not exercise its contractual rights for 30 years without violating the duty of good faith.  This proposition is not supported by New York law, which states that the duty of good faith cannot be used to contradict the express terms of a contract.  The duty of good faith can modify the exercise of contractual rights, but applying the duty as Curtis seeks to would eliminate HVB's right to demand early

repayment altogether.  In recognition of this dilemma, which appears unique to creditors, New York courts have specifically held that a financing institution does not act in bad faith by exercising a contractual right to terminate financing. Curtis's breach of good faith claim must be dismissed.

## III.   CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Sidley Austin Brown Wood, LLP's Motion to Dismiss [75], Defendant Raymond J. Ruble's Motion to Dismiss and to Join in the Motion Filed by Sidley [74], Defendants Bayerische Hypo-Und Vereinsbank, AG ("Bayerische") and HVB U.S. Finance, Inc.'s  Motion to Dismiss [76], Defendant Leboeuf, Lamb, Greene & Macrae, LLP's Motion to Dismiss [77] and Defendant Domenick Degiorgio's Motion to Dismiss [96] are **GRANTED** consistent with the terms of this Order.

**IT IS FURTHER ORDERED** that Plaintiff Curtis Investment Company's ("Curtis") Motion for Oral Argument [83] with respect to the motions to dismiss is **DENIED.**

**SO ORDERED** this 20th day of December, 2007.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE